UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WATERMARK SENIOR LIVING
RETIREMENT COMMUNITIES, INC.,

       Plaintiff,

vs.

MORRISON MANAGEMENT
SPECIALISTS, INC.,

       Defendant.
_____/

Case No. 17-11886
Hon. Mark A. Goldsmith

**OPINION & ORDER**
**DENYING PLAINTIFF WATERMARK'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 40) AND DENYING DEFENDANT MORRISON'S MOTION FOR SUMMARY JUDGMENT (Dkt. 41)**

In 2012, Willie Mae Henderson, a resident at one of Plaintiff Watermark Senior Living Retirement Communities, Inc.'s facilities, gained access to and ingested a toxic chemical from one of the community kitchens, which resulted in her death. Henderson's estate sued Watermark in a Michigan state court for negligence. The case went to trial. Watermark argued to the jury that Henderson had pried open a locked cabinet door to access the chemical, and that neither it nor its dining services contractor, Defendant Morrison Management Specialists, Inc., had any fault in Henderson's death. The jury sided with Henderson's estate and awarded more than $5 million in damages. The case settled in post-trial mediation. Shortly thereafter, Watermark brought this action against Morrison alleging that it breached its contractual obligation to use ordinary care to maintain the facility's kitchen area in a reasonably safe condition.

The parties have filed cross-motions for summary judgment (Dkts. 40, 41), response briefs (Dkts. 43, 44), and reply briefs in support of their motions (Dkts. 46, 47). The Court heard oral

argument on December 4, 2020. For the following reasons, the Court denies both motions.

## I. BACKGROUND

Henderson resided at Watermark's assisted-living community, The Fountains of Franklin. Watermark is a company that provides management and operations staffing to retirement communities, including The Fountains of Franklin. Lubanski Dep., Ex. C to Morrison Mot. for Summ. J. ("Morrison MSJ"), at 6 (Dkt. 41-4). The Fountains of Franklin community has different levels of care, including a memory care unit. Id. at 12-13. On October 21, 2012, Henderson moved into an area within the community known as the Terrace, which provides care to individuals who are in the mid- to late-stages of dementia, and may require more physical assistance. Id. at 15.

In 2012, Watermark had a service contract with Morrison to prepare meals for The Fountains of Franklin residents. Id. at 36; see also 5/1/2007 Agreement, Ex. A to Morrison MSJ (Dkt. 41-2).[1] Morrison prepared the meals, and Morrison and Watermark staff served the meals to the residents. Lubanski Dep. at 26. Because residents had access to the kitchen area, Watermark took precautionary steps to prevent accidents, such as installing locks on the refrigerators, removing knobs from stoves, and reducing tap water temperature. Id. at 34-39. It also had "mag locks" on some of the cabinets where toxic detergents were stored. Id. at 42-43, 46-47. The mag lock mechanism involved using a magnet placed on the outside of the cabinet to disengage the locking mechanism on the inside of the cabinet. Id. at 45. The Fountains of Franklin's executive director, Cathy Lubanski, testified that her facility was responsible for maintaining the cabinets and the mag locks, but she also testified that Morrison staff were responsible for securing the cabinets after food service was over. Id. at 48-49.

---

[1] The original agreement was between Morrison and Sunrise IV Franklin SL, LLC, Watermark's predecessor in interest.

On December 1, 2012, Morrison employees Damien Devine and Wendy Lloyd-Hill provided food service in the kitchen area near the Terrace. Devine and Lloyd-Hill began the evening shift at about 4:30 p.m. Trial Tr. Vol. 6 (Devine), Ex. B to Morrison Resp., at 59, 63 (Dkt. 43-3). Devine testified that he opened the mag-locked cabinet door to retrieve dishwashing liquid at approximately 5:30 p.m. Id. at 68-70. He filled a sink with water, added the dishwashing liquid, and returned the dishwashing liquid bottle to the mag-locked cabinet. Id. at 71. At the end of the shift, Devine testified that he had checked all of the cabinets by pulling on the doors to ensure that they had been locked. Id. at 75-76. He testified that there was no doubt in his mind that the cabinet doors had been properly secured. Id. at 78; see also Trial Tr. Vol. 6 (Lloyd-Hill), Ex. C to Morrison Resp., at 121 (Dkt. 43-4) (testifying that the cabinet door was secure while she and Devine were working and when they left). Devine and Lloyd-Hill left the kitchen area at approximately 7:00 p.m. Trial Tr. Vol. 6 (Devine) at 79.

Sometime after Devine and Lloyd-Hill left, Henderson entered the kitchen area and gained access to one of the detergent containers located in the mag-locked cabinet. She ingested the detergent, which later resulted in her death. Lubanski Dep. at 49; Compl. ¶¶ 5-7 (Dkt. 1). No one saw Henderson access the cabinet; no one saw her ingest the detergent; no one knows for sure how Henderson gained access to the detergent. Lubanski Dep. at 50-51. Lubanski spoke with Devine and Lloyd-Hill, maintenance personnel, and other staff about the incident. Id. at 64-66. Lubanski believed Devine and Lloyd-Hill when they told her that they had locked the cabinet containing the detergent before they left for the evening. Id. at 52. In Lubanski's opinion, Henderson pried open the lock. Id. She noted that after the incident, there was some damage to the cabinet. A work order dated the following day indicates that there may have been a problem with the latching mechanism. Id. at 56. It is not clear whether the cabinet door was in disrepair before Henderson

accessed the cabinet. See id. at 56-60.

Following Henderson's death, her estate sued Watermark in state court ("Henderson action"). In 2015, a Michigan jury awarded Henderson's estate $5,080,000. Watermark Resp. at 2. After case evaluation sanctions, the total judgment exceeded $5,800,000. In a post-trial mediation, the case settled for $3,650,000. Id. Shortly thereafter, Watermark filed the present action against Morrison, alleging that Morrison had breached its contractual obligation to use ordinary care to maintain the facility's kitchen area in a reasonably safe condition when Devine and Lloyd-Hill left the cabinet door unlocked.

The crucial question in this case, as well as in the Henderson action, is what happened on December 1, 2012, between 7 p.m. and 8:18 p.m., when Henderson entered the kitchen area near the Terrace and gained access to a toxic detergent. The evidence presented at trial pointed to different possibilities.

Morrison's employees testified that the cabinet doors had been secured before they left the kitchen area for the evening. Indeed, that was the position that Watermark took at the Henderson trial, namely that the cabinet doors in its kitchen area had been properly secured, and that Henderson must have pried open the cabinet door.

At the Henderson trial, several expert witnesses gave testimony. Nursing home expert witness Michael Brody testified that he did not believe that a wheelchair-bound, ninety-year-old, resident had the strength to pry open a mag-locked door. In his opinion, the most likely scenario was that Devine and Lloyd-Hill had left the cabinet door unlocked. Trial Tr. Vol. 3 (Brody), Ex. I to Watermark Resp., at 155, 218, 221-224 (Dkt. 43-10). His opinion was consistent with Oakland County Chief Medical Examiner Ljubisa Dragovic's testimony that he did not observe any injury to Henderson's fingers or fingernails. Trial Tr. Vol. 1 (Dragovic), Ex. L to Watermark Resp., at

4

63-64 (Dkt. 42-13). However, engineering expert witness Harold Josephs, Ph.D., raised concerns that the mag lock might not have been installed correctly, or that one of the cabinet door hinges might have come loose, because he spoke with witnesses who, immediately after Henderson was discovered in the kitchen area, were able to open the cabinet doors without any problem. Trial Tr. Vol. 5 (Josephs), Ex. J to Watermark Resp., at 133-138 (Dkt. 43-11).

The parties have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56.

## II. STANDARD OF DECISION

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III. ANALYSIS

Because both parties filed motions for summary judgment, each motion will be addressed separately.

**A. Watermark's Motion for Summary Judgment (Dkt. 40)**

Watermark's motion seeks to eliminate Morrison's laches defense. It argues that (i) laches is not a viable defense as a matter of law, (ii) Morrison is equitably estopped from raising laches as a defense, and (iii) Watermark is entitled to summary judgment on the laches defense because it necessarily relies on privileged information. The Court will take the arguments in turn.

**1. Laches**

Watermark argues that laches is not a viable defense in this case, because it filed its claim within the six-year statute of limitation. Watermark Mot. for Summ. J. ("Watermark MSJ") at 8-10. Morrison argues that laches is an available defense in this action under Michigan law. Resp. at 1-2. Morrison is correct.

As this Court explained in its prior opinion, laches is an affirmative defense that bars an action where there is an unexcused or unexplained delay in commencing the action resulting in prejudice to an opposing party. Pub. Health Dep't v. Rivergate Manor, 550 N.W.2d 515, 520 (Mich. 1996). Although the passage of time is important, "laches is not triggered by the passage of time alone." Knight v. Northpointe Bank, 832 N.W.2d 439, 442 (Mich. Ct. App. 2013) (citation omitted). "It is the prejudice occasioned by the delay that justifies the application of laches." Id. Generally, "'[w]here the situation of neither party has changed materially, and the delay of one has not put the other in a worse condition, the defense of laches cannot . . . be recognized.'" Kuhn v. Sec'y of State, 579 N.W.2d 101, 108 (Mich. Ct. App. 1998) (quoting Lothian v. City of Detroit, 324 N.W.2d 9, 14 (Mich. 1982)).

There is an interplay between laches and the statute of limitations. Innovation Ventures, LLC v. Custom Nutrition Labs., LLC, 912 F.3d 316, 343 (6th Cir. 2018). Under Michigan law, a claim filed within the statute of limitation gives rise to a rebuttable presumption that any delay in

6

the filing of the complaint was reasonable. Id. When the presumption is rebutted, however, laches may bar a claim even where the applicable statute of limitations has not expired. Tenneco Inc. v. Amerisure Mut. Ins. Co., 761 N.W.2d 846, 864 (Mich. Ct. App. 2008).

Watermark argues that the doctrine of laches is barred as a matter of law, because it filed its breach of contract claim within the statute of limitations. Watermark MSJ at 9 (citing Michigan Educ. Employees Mut. Ins. Co. ["MEEMIC"] v. Morris, 596 N.W.2d 142, 152 (Mich. 1999)). But MEEMIC does not stand for the proposition that laches does not apply to any action brought within the statute of limitations. That case explained that "because MEEMIC filed [its] case within the six-year period of limitation, any delay in the filing of the complaint was presumptively reasonable, and the doctrine of laches is simply inapplicable." MEEMIC, 596 N.W.2d at 152 (emphasis added). As noted above, both the Michigan Court of Appeals and the Sixth Circuit, applying Michigan law, have found that the laches defense is not necessarily barred simply because a case is brought within the statute of limitations. Innovation Ventures, 912 F.3d at 343; Tenneco, 761 N.W.2d at 864.

Watermark relies principally on City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581 (6th Cir. 2001), for its argument that laches is barred as a matter of law. Its reliance is misplaced. In that case, the Sixth Circuit found that the district court did not abuse its discretion in ruling that laches did not bar the City's breach of contract claim. Id. at 589. Without explanation, the Sixth Circuit said that "[h]aving already concluded that the City brought the claim within the applicable statute-of-limitations period, the doctrine of laches has no role in this case." Id. However, it also noted the rule from MEEMIC that "a cause of action filed within the six-year statute-of-limitations period is presumptively reasonable." Id. (emphasis added) (citing MEEMIC, 596 N.W.2d at 152). So while Wyandotte can be read as barring laches categorically in contract cases filed within the

7

statute of limitations, the better reading is that filing a complaint within the limitations period raises a rebuttable presumption that any delay is reasonable, which is how subsequent Michigan courts and the Sixth Circuit have viewed the matter, see Innovation Ventures, 912 F.3d at 343; Tenneco, 761 N.W.2d at 864.[2] Therefore, Morrison may raise a laches defense to Watermark's breach of contract claim even though Watermark filed its breach of contract claim within the statute of limitations.

### 2. Equitable Estoppel

Watermark also argues that Morrison is estopped from asserting laches, because Morrison had notice of the Henderson action, and it coordinated with Watermark's attorneys regarding taking Devine's and Lloyd-Hill's depositions. Watermark MSJ at 10. It argues that under these circumstances, Morrison should be precluded from asserting laches based on Watermark's decision not to file a third-party complaint against it. Id. at 11. Morrison argues that Watermark's position is baseless, because, until this lawsuit, it never attributed any wrongdoing to Morrison. Resp. at 7. Watermark's argument fails because it is underdeveloped.

The doctrine of equitable estoppel applies where "(1) a party, by representations,

---

[2] Watermark also cites SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC, 137 S. Ct. 954, 963, (2017), which noted that "it would be exceedingly unusual, if not unprecedented, if Congress chose to include in the Patent Act both a statute of limitations for damages and a laches provision applicable to a damages claim." But the Supreme Court made the statement in the context of rejecting the argument that Congress intended both defenses in enacting the Patent Act. By contrast, our case does not involve a statute with a single legislative source for both defenses; it involves a legislative source for the limitations defense and a judicial source for the equitable defense of laches. In any case, whatever oddness there may be in the availability of two defenses addressing timeliness, Michigan law allows for the invocation of each defense in appropriate circumstances. This Court is bound by the Sixth Circuit's decision that, under Michigan law, laches is not barred even when a legal claim is filed within the statute of limitations. Innovation Ventures, 912 F.3d at 343.

admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." W. Am. Ins. Co. v. Meridian Mut. Ins. Co., 583 N.W.2d 548, 550 (Mich. Ct. App. 1998). "[B]ecause the doctrine is intended to ensure fair dealing between the parties, the courts will apply the doctrine only if the party asserting the estoppel . . . has detrimentally relied upon his opponent's prior position." Lichon v. Am. Universal Ins. Co., 459 N.W.2d 288, 292-293 (Mich. 1990) (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982)) (internal quotation marks omitted).

It is not entirely clear how Watermark's argument maps onto the equitable estoppel legal standard. It argues that Morrison knew about the Henderson action, but that it decided not to join the action. Morrison does not dispute this point. Resp. at 7. So it is not clear what facts (or omissions) Watermark justifiably relied on that Morrison is now denying such that it prejudices Watermark in some fashion. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997) (citation and marks omitted)). Watermark has waived this argument for purposes of summary judgment.

### 3. Privilege Claims

Watermark makes one final attempt to defeat Morrison's laches defense by arguing that the defense necessarily relies on information protected by the work product doctrine, the settlement privilege, and the attorney judgment rule. Mot. at 13-15. Specifically, Watermark seeks to dismiss Morrison's laches defense, any argument related to the foreseeability of damages, and issues related to mitigation of damages. Id. at 15. Morrison argues that Watermark has cited no authority

9

suggesting that Watermark can prevent an opposing party's defense by asserting a privilege; it also argues that the information upon which Morrison relies is already in the public record. See Resp. at 7. The Court agrees with Morrison.

Briefly, "the work product doctrine generally protects from disclosure documents prepared by or for an attorney in anticipation of litigation." Reg'l Airport Auth. of Louisville v. LFG, LLC, 460 F.3d 697, 713 (6th Cir. 2006). Federal Rules of Evidence 408 provides that evidence of "conduct or statements made in compromise negotiations" is not admissible evidence. Fed. R. Evid. 408(a). However, Rule 408 "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc., 332 F.3d 976, 979 (6th Cir. 2003). The attorney-judgment rule is a defense to a legal malpractice claim where an attorney's tactical litigation decisions "do not show a violation of the duty to perform as a reasonably competent . . . lawyer." Taylor v. Monroe Cty. Senior Legal Servs., Inc., No. 292266, 2010 WL 4774272, at *2 (Mich. Ct. App. Nov. 23, 2010) (citing Simko v. Blake, 532 N.W.2d 842 (Mich. 1995)).

Watermark's privilege arguments do not pass muster. It argues broadly that Morrison's defenses will necessarily reveal privileged information. At oral argument, Watermark clarified that its primary concern is that in order to defend against Morrison's laches argument, it will necessarily have to defend its attorneys' work product, specifically its attorneys' mental impressions related to litigating the Henderson action. As Watermark notes, the work product privilege is generally understood to shield materials prepared by or for an attorney in the course of legal representation from an adverse party's discovery requests. Watermark MSJ at 12 (citing Fed. R. Civ. P. 26(b)(3)(A)). But Morrison is not seeking any discovery at this stage in the litigation.

Watermark's attempt to turn a discovery shield into a litigation sword to defeat Morrison's laches defense is unfounded. Watermark cites no authority, and the Court is not aware of any, suggesting that the work product doctrine can be asserted offensively in this manner.

Watermark's settlement privilege and attorney judgment rule arguments fare no better. Watermark does not explain what the settlement privilege applies to in this case. There were settlement negotiations in the Henderson case, but what statements or communications arising from those negotiations Watermark seeks to preclude is not clear. According to Morrison, everything it is relying on is in the public record, a point that Watermark does not refute. And it is unclear how the attorney judgment rule, an affirmative defense to a legal malpractice claim, applies in this case. Again, a court need not develop an argument that a party has failed to develop itself. See McPherson, 125 F.3d at 995-996.

Therefore, Watermark's motion is denied in its entirety.

### B. Morrison's Motion for Summary Judgment (Dkt. 41)

Morrison argues that it is entitled to summary judgement because (i) Watermark's judicial admissions bar any recovery, (ii) Watermark cannot establish a breach of the parties' agreement, (iii) the doctrine of laches bars this action, (iv) Watermark waived consequential damages, (v) the damages in this case do not naturally arise from the alleged breach or were not foreseeable, and (vi) Watermark is obligated to indemnify Morrison.[3] Morrison's arguments will be taken in turn.

#### 1. Judicial Admissions

Morrison argues that Watermark is bound by the judicial admissions made in the

---

[3] Morrison also argues that it is entitled to attorney fees under the parties' agreement. Morrison MSJ at 26. However, the relevant provision of the agreement applies only to the "prevailing party." Agreement ¶ 9.4. Because there is no prevailing party at this time, the argument is premature.

Henderson case. Morrison MSJ at 10-13. Watermark argues that its statements in the Henderson case are not binding in this case. Resp. at 7-10. Watermark has the better part of the argument.

Watermark is correct that admissions made in a prior action are not binding on a party in a subsequent action, unless judicial estoppel applies.[4] Resp. at 7. Statements from a prior action might qualify as evidentiary admissions, but judicial admissions "are formal admissions in the pleadings of a present action, which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." Cadle Co. II v. Gasbusters Prod. I Ltd. P'ship, 441 F. App'x 310, 312 (6th Cir. 2011) (emphasis added) (internal marks and citations omitted).[5] In the Sixth Circuit, a court errs if it makes a ruling solely on judicial admissions from a prior proceeding. Id. at 315; see also State Farm Mut. Auto. Ins. Co. v. Worthington, 405 F.2d 683, 686 (8th Cir. 1968) ("These and similar cases hold that judicial admissions are binding for the purpose of the case in which the admissions are made including appeals. This does not make the same judicial admissions conclusive and binding in separate and subsequent cases."); accord Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972) ("It has been held that judicial admissions are binding for the purpose of the case in which the admissions are made including appeals."). "'Judicial admissions are conclusive in their nature but that effect is confined to the cause in which they are made. When used in other cases as ordinary admissions, they are, of course, not conclusive.'" Worthington, 405 F.2d at 686 (quoting IX Wigmore, Evidence § 1066 (3rd ed. 1940)). While the statements made in the Henderson action may qualify as evidentiary

---

[4] Watermark raises the possibility that Morrison is arguing judicial estoppel. Resp. at 8. However, Morrison does not raise judicial estoppel in its motion, and it does not address judicial estoppel in its reply brief. Therefore, there is no need to resolve whether judicial estoppel might apply.

[5] Other admissions, such as deposition testimony, stipulations, or attorney statements during trial, can also qualify as judicial admissions. See Cadle, 441 F. App'x at 312; see also MacDonald v. Gen. Motors Corp., 110 F.3d 337, 340 (6th Cir. 1997).

admissions, they do not constitute judicial admissions that would foreclose Watermark from pursuing its breach claim against Morrison.

### 2. Breach of Contract

Morrison argues that Watermark cannot meet its burden of establishing a breach of the agreement between them, because there is no evidence that the cabinet door had been left unlocked. Morrison MSJ at 13-14. Watermark argues that there is overwhelming evidence that the door had been left unlocked. Resp. at 20. Whether the cabinet door had been secured before Henderson entered the kitchen is fact bound. Watermark has presented enough evidence to submit the question to the jury.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." Miller-Davis Co. v. Ahrens Constr., Inc., 848 N.W.2d 95, 104 (Mich. 2014). The focus of Morrison's argument is on the breach element.

Morrison argues that there is no evidence that its employees left the cabinet doors unlocked. Morrison MSJ at 14-15. Not true. As noted above, Watermark relies on expert testimony opining that the cabinet doors had been left unlocked, which is further supported by additional expert testimony observing that Henderson's fingers showed no signs of injury resulting from forcing open a locked cabinet door. Morrison attempts to undermine this evidence by pointing to Watermark's theory of the case in the Henderson action—i.e., Henderson pried open the cabinet door—and by calling into question its motives for bringing this action. Specifically, it argues that the only reason Watermark brought this case is because it suffered a significant loss at the Henderson trial. Id. at 15. But these arguments have no bearing on whether Watermark has provided evidence from which a jury could conclude that Morrison breached a contractual

13

obligation to use ordinary care to maintain the Terrace's kitchen area in a reasonably safe condition.

Morrison does not dispute that leaving a cabinet unlocked containing toxic chemicals near a memory care unit would be a breach of its contractual duties. Watermark has provided more than mere speculation that Morrison employees left the cabinet door unlocked on December 1, 2012. Therefore, summary judgment cannot be granted on Watermark's breach of contract claim.

### 3. Laches

Morrison argues that the doctrine of laches bars Watermark's breach of contract claim as a matter of law, relying principally on Tenneco and Knight. Morrison MSJ at 15-17. Watermark argues that Morrison's laches defense cannot succeed on a motion for summary judgment. Resp. at 10. Watermark is correct that this issue cannot be resolved as a matter of law on this record.

As noted above, "[f]or laches to apply, inexcusable delay in bringing suit must have resulted in prejudice." Tenneco, 761 N.W.2d at 864. "Although the question of prejudice is generally a question of fact, it is one of law for the court when only one conclusion can be drawn from the undisputed facts." Id. at 859 (internal marks and citations omitted).

Tenneco is distinguishable on the facts. In that case, the plaintiff's predecessor used volatile organic compounds, trichloroethylene ("TCE") and trichloroethane ("TCA"), for decades to manufacture auto parts. Id. at 851. It disposed of the wastewater and sludge containing the TCE and TCA at its manufacturing sites and at nearby landfills. Id. The TCE and TCA contaminated local groundwater, and the plaintiff incurred substantial environmental cleanup costs. Id. Although the plaintiff had a general liability and umbrella insurance policy, the "plaintiff settled several third-party claims and entered into several stipulations and consent orders with various governmental agencies for remedial action, all without providing defendant any specific

notice of its actions." Id. at 860. More than six years later, the plaintiff brought suit against its insurance provider seeking declaratory relief and alleging a breach of contract claim arguing that the environmental cleanup costs incurred were covered by its insurance policy. Id. at 851. The court of appeals held that the plaintiff's claims were barred by laches, because "failure to give notice of suit deprived defendant of the opportunity to promptly contest its liability to the insured, participate in settlement negotiations, or contest plaintiff's liability." Id. at 862. "Prejudice to defendant is clear because plaintiff waited years after its liability had been cemented by its own settlements, stipulations, and consent decrees before seeking reimbursement from defendant." Id.

While there are some similarities between Tenneco and the present case, in that the stakes of this case may have been cemented by the Henderson action, a key distinction requires a different result. Namely, Morrison had notice of the Henderson action from the beginning of the case. Indeed, Morrison attorneys attended Devine's and Lloyd-Hill's depositions. See Devine Dep. at 2 (attorney appearing on behalf of Morrison Senior Dining); see also Lloyd-Hill Dep. at 2 (same). A Morrison attorney also attended the post-trial Henderson mediation. Watermark MSJ at 10. Unlike the Tenneco defendant, Morrison had the information necessary to make decisions in its best interests with respect to the Henderson action. Whether Morrison should have protected its interests in some way to avoid the potential prejudice in this case is a jury question.

At oral argument, Morrison argued that notice does not preclude this Court from granting its motion by relying on Knight. Although the Knight court found that notice did not bar a laches defense, that ruling was made in light of significant prejudice to the defendant. In Knight, the court found that laches barred the plaintiff's quiet title action. Knight, 832 N.W.2d at 440. The defendant bank foreclosed on a 200-acre property, and it later purchased the property at a sheriff's sale. Id. at 441. Despite having notice, the plaintiff waited more than ten years before bringing

15

her action against the defendant bank to quiet title to the property. Id. at 441. The court found that the bank had been severely prejudiced by the delay, because the property had exchanged hands several times over the ten-year period, the two most important witnesses in the quiet title action had died, and the defendant bank's financial exposure had increased due to the plaintiff's delay in bringing the quiet title action. Id. at 443-444.

The Knight plaintiff argued, among other things, that the defendant bank could not succeed on its laches defense because it was on notice that the property title was defective. Id. at 444. The plaintiff's sister had transferred the property from her mother to herself using a power of attorney, which the plaintiff argued amounted to self-dealing and, therefore, made the title facially invalid. Id. The court disagreed. It explained that while an agent cannot generally transfer title to himself or herself, if the transfer is not inconsistent with the agent's duty to the principal, the agent can make a valid transfer. Id. However, because the mother and sister had both died, the defendant bank could not present evidence that the sister had made a valid property transfer. Id. Therefore, even if the defendant bank should have known that there was a potentially invalid property transfer, the significant prejudice caused by the delay in bringing the quiet title action did not preclude the laches defense. See id.

The prejudice caused by Watermark's delay in bringing this action is unlike the prejudice in Knight. Morrison argues that it has been irreparably prejudiced because Watermark seeks to recover its $3.65 million settlement loss in this action. It maintains that allowing such a recovery is fundamentally unfair, because Morrison was not able to put on a defense in the Henderson action or choose whether to resolve any claims against it pre-trial. Morrison MSJ. at 18-19. But unlike Knight, where the defendant could not raise a proper defense to the quiet title claim because the key witnesses had died, Morrison's evidence is still available. It may be that the relevant

16

witnesses' memories have faded since the time of the Henderson action, but that is somewhat offset by their previous depositions and trial testimony, which will likely refresh the witnesses' recollection of the matter.

As noted above, "the question of prejudice is generally a question of fact." Tenneco, 761 N.W.2d at 859. The undisputed facts in this case do not lead the Court to draw only one conclusion with respect to prejudice such that summary judgment is warranted. Therefore, Morrison is not entitled to prevail summarily on its laches defense.

### 4. Consequential Damages

Morrison argues that Watermark waived any right to consequential damages in this case, because the parties contracted to not hold each other liable for the other's negligence in Section 6.3 of their agreement. Morrison MSJ at 19-20. Watermark argues that the relevant section is an indemnification provision, and not a provision waiving any and all consequential damages. Resp. at 28-29. Morrison's argument lacks merit.

When construing a contract, a court's primary objective is to determine the parties' intent. Quality Prod. & Concepts Co. v. Nagel Precision, Inc., 666 N.W.2d 251, 259 (Mich. 2003). When a contract is clear and unambiguous, the provisions reflect the parties' intent as a matter of law, and courts are to enforce the language as written in accordance with its plain and ordinary meaning. Coates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007). "[A] waiver is a voluntary and intentional abandonment of a known right." Quality Prod. & Concepts Co. v. Nagel Precision, Inc., 666 N.W.2d 251, 258 (Mich. 2003). "An affirmative expression of assent constitutes a waiver." Nexteer Auto. Corp. v. Mando Am. Corp., 886 N.W.2d 906, 909 (Mich. Ct. App. 2016).

The parties' agreement contains the following indemnification provision:

17

> 6.3 Indemnity. (b) Subject to Sections 6.2 and 6.4, the Community shall indemnify, defend and hold harmless Morrison and its officers, agents and employees, with respect to any and all liability, losses, claims, suits, damages, taxes, charges and demands of any kind and nature by any party which any of them may incur or suffer as a result of any cause of action relating solely to or arising solely out of any negligent act or omission of Community. Community shall not have an obligation to indemnify Morrison for any liability, losses, claims, suits, damages, taxes, charges or demands of any kind or nature arising out of any intentional or negligent acts or omissions of the [sic] Morrison.

Agreement, Ex. A to Resp. ¶ 6.3(b) (Dkt. 41-2).

The above contract provision is not a voluntary and intentional abandonment of any and all consequential damages that might arise between the parties from any and all actions. Watermark agreed to hold Morrison harmless "as a result of any cause of action relating <u>solely to</u> or <u>arising solely out of</u> any negligent act or omission of" Watermark. However, the agreement is clear that Watermark does "not have an obligation to indemnify Morrison for any liability, losses, claims, suits, damages, taxes, charges or demands of any kind or nature <u>arising out of any intentional or negligent acts or omissions of the [sic] Morrison</u>." And as this Court has stated previously, "neither the Sixth Circuit nor the state court jury found that Watermark was solely responsible for Henderson's death. The state court jury was not asked to determine whether Morrison had any level of responsibility in the matter." <u>Watermark Senior Living Retirement Communities, Inc. v. Morrison Mgmt. Specialists, Inc.</u>, No. 17-11886, 2019 WL 4051730, at *4 (E.D. Mich. Aug. 28, 2019).

Because Morrison's fault with respect to securing the cabinet door has never been determined by a factfinder, and because its fault cannot be determined based on the current record, the indemnification issue cannot be resolved by way of summary judgment.

**5. Damages Arising from Alleged Breach**

Morrison argues that the damages in this case do not arise naturally from the alleged breach,

and that the parties did not contemplate such damages at the time their agreement was made. Morrison MSJ at 22. Watermark argues that Morrison's argument is essentially a rehash of the argument the Court already rejected when it denied its motion for judgment on the pleadings. Resp. at 21. The Court agrees.

Morrison's argument, in large measure a direct replication of its motion for judgment on the pleadings, does not appear to raise any new issues. The Court has already considered and rejected Morrison's position that the damages alleged in this case do not arise naturally from the alleged breach of contract, and that the damages were not foreseeable. See Watermark, 2019 WL 4051730, at *4. If Morrison did not agree with the resolution of its motion for judgment on the pleadings, it could have filed a motion for reconsideration. Morrison chose not to file a motion for reconsideration, and the time to do so has long passed. Morrison's motion for summary judgment is denied with respect to damages arising from the alleged breach for the reasons set forth in the Court's previous opinion. Id.

### 6. Contractual Indemnity

Morrison argues that Watermark is contractually obligated to defend and indemnify Morrison for the damages claim asserted in this case. Morrison MSJ at 25-26 (citing Agreement ¶ 6.3(b)). It argues that the damages Watermark seeks arose "exclusively" from a finding of negligence against it. Id. That may be so, but that does not resolve whether Watermark must indemnify Morrison. As explained above, there is a fact question with respect to whether Henderson's death was caused solely by Watermark's negligence. If a jury finds that Morrison had any liability in Henderson's death, the indemnification provision simply would not apply, even though the damages arose "exclusively" from a finding of negligence in the Henderson action. Therefore, summary judgment is not appropriate on the contractual indemnification issue.

## IV. CONCLUSION

For the reasons stated above, Watermark's motion for partial summary judgment (Dkt. 40) and Morrison's motion for summary judgment (Dkt. 41) are denied.

SO ORDERED.

Dated: December 14, 2020             s/Mark A. Goldsmith
      Detroit, Michigan             MARK A. GOLDSMITH
                                      United States District Judge